**PEIZER, d. b. a. COMMUNITY INVESTMENT CO., Plaintiff-Appellee, v. BERGEON, Defendants-Appellants.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 25001.  Decided February 18, 1960.

Harry J. Elconin, for plaintiff-appellee.
Michael A. Picciano, Alan Meltzer, for defendants-appellants.

## OPINION

By SKEEL, J.

This appeal comes to this court on questions of law from a judgment entered for the plaintiff in the Municipal Court of Cleveland.  The action is one based on a cognovit note.  The judgment entered by confession on the cognovit feature of the note was vacated upon motion, an answer was filed by the defendants-appellants and trial proceeded on the issues made by the pleadings.  From the judgment entered for the plaintiff upon the verdict of a jury, the defendants claim the following errors:

"1. The verdict of the jury and the judgment of the Court is against the manifest weight of the evidence.

"2. The verdict of the jury and the judgment of the Court is contrary to the evidence and is not supported by the evidence.

"3. The judgment of the Court is contrary to law.

"4. The Court erred in its charge to the jury, to which the plaintiff at the time excepted.

"5. The Court erred in overruling the motions for directed verdict in favor of the defendants made at the conclusion of the plaintiff's case and renewed at the conclusion of all the evidence.

"6. The Court erred in overruling the defendants' motion for judgment notwithstanding the verdict.

"7. The Court erred in overruling the defendants' motion for new trial.

"8. For other errors apparent on the face of the record."

The defendants are the owners of a single family residence known as 8915 Columbia Avenue in Cleveland, Ohio, which prior to about March 20, 1958, was incumbered with two mortgages. The first mortgage was held by The Cleveland Trust Company with a balance due as of about the first of January, 1958, of $3310.00, the monthly payments being $59.33. The second mortgage was held by the Security Federal Savings and Loan Company, on which the balance was about $3500.00, with monthly payments of $76.81. The Cleveland Trust Company had threatened foreclosure because of some delinquencies, the extent of which is not disclosed by the record. The defendants felt forced to seek refinancing and hoped to consolidate the two mortgages into one.

They had investigated one or two banks or savings and loan companies, particularly The State Savings and Loan Company, without success. Upon a personal recommendation by an acquaintance, Mr. Bergeon called on William H. Kahan, a lawyer, whose offices are at 1001 Hippodrome Building. After hearing the Bergeons' difficulties, he called in his son-in-law, the plaintiff (said to be doing business under the assumed name of Community Investment Company) to find refinancing for the defendants. The facts necessary as a basis for seeking a new mortgage were set down on a form headed "Community Investment Co." The plaintiff testified that Bergeon begged and pleaded with him for help. Mr. Bergeon was assured by both men that refinancing could be obtained. The date of this meeting was February 20, 1958. This is the date shown on the instrument said to represent the agreement to employ the plaintiff.

On Saturday, February 22, the plaintiff, Lawrence Peizer, called at the Bergeon home to inspect the house, demanded and received $15.00 for taking two or three pictures with a polaroid camera. He testified that he read the agreement to the defendants, including the obligation to pay 10% of the amount of the refinancing as a fee. He agreed, however, that he would be satisfied, even though a loan of $8000 would be required, to take $700 as his fee, for which amount a cognovit note and an agreement were then signed by the defendants after, as he testified, he gave full explanation of both the agreement and the note. The defendants claim the contract and note were signed in blank.

The evidence is in considerable dispute as to wheher the contract entered into whereby the "Community Investment Company" was to be paid

"a fee of 10% of all financing received for services rendered and to

be rendered for us and in our behalf in the refinancing of our property. Said fee shall be due and payable when a commitment has been obtained for said refinancing and shall be exclusive of any charges made by the mortgagee to the borrower,"
was executed on the first meeting in Mr. Kahan's office or whether it was executed on the first visit of the plaintiff to the defendants' home. Mr. Kahan testified that on defendants' visit to his office: "* * * Yes, he signed it in my presence, yes." The plaintiff testified it was signed at the Bergeons' house on Saturday, February 22, 1958. The contract is dated February 20, 1958 (which was a Thursday), but the note is dated February 22, 1958. Both the contract and the note are signed by both defendants, Earl Bergeon and Mattie Bergeon, but Mrs. Bergeon was not with her husband on his first visit to the law office of William H. Kahan.

There is some evidence given by the plaintiff that he contacted a number of financial institutions, including The State Savings and Loan Company, where defendants' application had previously been turned down. The plaintiff testified that he reported to the defendants two or three times a week and on each occasion he told them that he had not yet met with success.

On March 10 the defendant claims to have talked to Mr. Kahan in his office afer several previous unsuccessful calls, in which he (Earl Bergeon) expressed concern over the progress being made, it being the defendant's version of the conversation (which was proffered but erroneously not permitted to be given to the jury by the court) that if he, Bergeon, was not satisfied he should go somewhere else. On rebuttal, however, even though the objection to such question had been sustained, Mr. Kahan testified that no such conversation took place. He said:

"Q. Have you seen Mr. and Mrs. Bergeon from that day to this day?

"A. I got a call from Mr. Bergeon on the phone about the loan.

"Q. When?

"A. After a while he called up and said that he's going to get the loan elsewhere, to forget about it. I said, 'I have no right to forget about it, you hired Larry, you will have to pay him whether you got the loan by yourself or not.' "

In all events, the record shows that on that day (March 10, 1958) the defendants made application for a loan at the Security Federal Savings and Loan Association; that the appraisal was made March 12, 1958, the loan approved March 13, 1958, and the defendants notified on March 14, 1958, and the mortgage and note were signed on March 17, 1958. This loan was for $6900.00 at 6% for fifteen years, with a service fee of 1%.

The record also shows that on March 10 (the same day the defendants made application for a loan at the Security Federal Savings and Loan Association) a telephone call from plaintiff's office was made to the Broadview Savings and Loan Company, making an application for a loan for the defendants.

Noted on the application form, on which the loan company's em-

ployee (the downtown branch manager) marked down the information necessary for a loan application, is the following: "Elconin Ma 1-7388." Mr. Harry J. Elconin, attorney of record for the plaintiff in this case, is an office associate of Mr. Kahan, and the telephone number above is listed by the telephone company as that of Mr. Elconin. Why an application for a loan (by telephone) should have been made after twenty days had passed without a single application being filed with a financial institution is not explained in the record.

The application to Broadview on March 10, 1958, shows the "certificate of appraisal committee" was returned to the loan company on March 18, 1958, approving the property as of sufficient value for a loan of $8000 at 7% payable 1% a month plus insurance and taxes. The loan company's manager could not tell when he notified Elconin of the result of the appraisal but says it was not later than March 19, 1958. The plaintiff testified that he heard from the Broadview Savings and Loan Company of the appraisers' report and called the defendants to tell them of the good news either the evening of the 13th or the 14th of March. The plaintiff's testimony was as follows:

"Q. All right. Then what finally happened?

"A. The end result was, Broadview called me and told me that they were or would make the loan, and for me to have the Bergeons come down and sign a note and mortgage.

"Q. Now, when Broadview called you and told you that they would make a loan, you mean they gave you a commitment for a loan?

"A. Yes.

"Q. That means that all things being equal, they had made an appraisal and their appraisal justified the loan?

"A. Absolutely.

"Q. That does not mean that the loan was made, does it?

"A. No, no.

"Q. How, then, is the loan then consummated after that?

"A. Well, principals involved have got to go to the lending institution and sign a note and mortgage in order to secure it.

"Q. And then that is presented to the board or the loaning committee of the bank and then it is approved. But when Broadview called you, they had made the appraisal and had given you a commitment for how much?

"A. For $8,000.

"Q. And then was that - -

"A. They called me on or about the 13th, I believe it was the 13th. Wait a while, about the 13th or 14th of March.

"Q. The 13th or 14th of March, and what did you do as soon as you got that call?

"A. I called Mr. Bergeon.

"Q. And did you talk to him?

"A. Yes, I did.

"Q. Do you know Mr. Bergeon on the telephone?

"A. I should.

"Q. Why do you say that?

"A. Well, as I say, I have had quite a few conversations with him.

"Q. And you talked with him?

"A. Yes, I did.

"Q. What was that conversation?

"A. That conversation, when I called Mr. Bergeon I had informed him of the good news, that we were able to obtain a loan for him and that it would now be necessary for Mr. and Mrs. Bergeon to come down and sign a note and mortgage.

"Q. What did he say?

"A. He said fine, they would come down. They made an appointment with me for—I don't know if that was that Monday or Tuesday, and they never showed up.

"Q. Then what did you do?

"A. I called them again.

"Q. What did he say this time?

"A. This particular time he told me that the lending institution had the second mortgage on his property, had gotten in touch with him and had told them, they heard that he was in the market for a mortgage and why didn't he come to them, they may be able to arrange for a mortgage to cover the entire amount."

The record shows that no further effort was made by the plaintiff to get a binding commitment, it being his claim that he by these facts had procured a "commitment" whereby under the terms of his contract he was entitled to the amount as shown by the note as agreed, that is, Seven Hundred Dollars ($700.00).

The manager of the "downtown office" of Broadview Savings and Loan Company, who was the Broadview employee to whom Elconin presented the application by telephone, testified about the telephone call of March 10th during which he filled out the application, and said that he was to call Mr. Elconin as to whether the application was approved. He also said that the return of the appraisal committee was not a commitment; that after such report was returned to him the applicants would have to present themselves and verify whatever personal information he might want or such as the borrower might volunteer. He said he would then verify the applicant's employment and also get a "credit report issued on him." He further testified that an appraisal showing the property had sufficient value to justify the loan requested is not a commitment and is not considered as such until it is demonstrated to him that the persons seeking the loan are qualified, based on the standards set by the loan company. There is not a syllable of testimony to controvert this evidence. A commitment would have to come from the manager after all of the requirements had been met. The record is perfectly clear that the requirements necessary to establish a commitment binding the loan company to make a loan were never performed or completed by the plaintiff. The defendants did not appear as requested because on March 14, before the plaintiff's call to inform defendants of Broadview's appraisal, they had through their own efforts secured a loan on more favorable terms. When called on the evening of the 14th of March, defendants directed the plaintiff to go no further.

The agreement pleaded as consideration for the note was based on a contract which was unilateral in character and was clearly am-

biguous and uncertain. The terms of the mortgage to be secured, that is the interest to be paid, the payments to be made and the duration of the mortgage, were not set out or contained in the agreement. Could it be that the plaintiff could claim performance if the loan secured was to be for only one year or for 8% interest when the money market was on a 6% basis for the kind of financing here involved? We think not. We also find from the foregoing analysis of the evidence that there is no evidence that the plaintiff procured a commitment for the necessary financing needed by the defendants before the defendants notified him that they no longer desired plaintiff to continue his search for a mortgage loan to refinance their house.

The contract pleaded by the plaintiff is a unilateral agreement.

"A unilateral contract is one in which no promisor receives a promise as consideration for his promise. * * *"

Restatement of the Law of Contracts, page 10, Section 12.

In this case, there is no question but that the defendants could not state a cause of action against the plaintiff based on this agreement should he fail to find a mortgage for the defendants. It must be equally true that the plaintiff cannot recover from the defendants until his performance is complete. All that was done by the plaintiff, as shown by the record, was in preparation to perform, so that before performance the defendants could withdraw without liability.

The case of **Bretz et al. v. The Union Central Life Ins. Co., 134 Oh St 171, 16 N. E. 2d 262,** was an action seeking specific performance. The appellees were owners of a farm incumbered with two mortgages; the said appellees also owed unsecured obligations in a considerable amount. The appellant held the first ·mortgage. The appellees worked out a separate compromise with each of their creditors. The appellant agreed by written agreement to accept $8100 in settlement of its $10,348.16 mortgage, if paid within ninety days. The other mortgagee and the creditors agreed separately to like compromises, all of which were based on a new mortgage for $9300 being negotiated with the Farm Credit Association. In furtherance of the securing of the new loan, money was expended for a survey and an abstract of title and certain other acts were performed in compliance with the requirements of the Federal Land Bank of Louisville. The appellees then notified the bank and the National Farm Loan Association that they would not accept a reduction of its mortgage indebtedness, as per their contract, which was as follows:

"Upon payment to the undersigned of $8,100 on or before the ____ day of _____, 19 ____, or if paid thereafter, by including interest at the rate of ____ per centum per annum on $_____ from said date to the date of payment, said sum will be accepted in full satisfaction of this claim if payment is made within 90 days of the date of this commitment."

In reversing the judgment of the court of appeals directing the appellee to perform its compromise agreement, the court said on page 175:

"An offer, continuing or otherwise, to enter into a unilateral contract, unsupported by a valuable consideration, is not binding upon the

offeror, and is revocable at his will at any time prior to its acceptance. Though time for acceptance was prescribed, there was no obligation upon appellant to keep the offer open for the remainder of the period, and the right to revoke it before expiration, if not accepted, is clear.

" 'An offer, not supported by a consideration, may be revoked before acceptance, even though it expressly gives an offeree a definite time within which to accept.' William Weisman Realty Co. v. Cohen, 157 Minn., 161, 195 N. W., 898. See also 1 Williston on Contracts (Revised Ed.), 156, Section 55; 12 American Jurisprudence, 528, Section 32.

"Acceptance of an offer to enter into a unilateral contract can be effected only by the performance of the condition prescribed and within the time fixed. This means substantial performance and not merely steps taken preparatory to performance. Acts preparatory to performance tender neither consideration nor acceptance, no matter how extensive the preparation or how large the expense involved may be. Nothing less than performance will tender acceptance, and until such time the right to revoke remains unimpaired. See 1 Page Supplement on Contracts, 92, Section 192; Stensgaard v. Smith, 36 Minn. 181, 44 N. W., 669; Hollister v. Frellsen, 148 Miss., 568, 114 So. 385; Levin v. Dietz, 194 N. Y., 376, 87 N. E., 454; Petterson, Exrx., v. Pattberg, 248 N. Y., 86, 161 N. E., 428; Kolb v. J. E. Bennett Land Co., 74 Miss., 567, 21 So., 233; Restatement of the Law of Contracts, 53, Section 45, Comment a."

With reference to the subject of "Unilateral Contracts," it is stated in 9 O. Jur., 239, Section 5, that:

"The contract does not come into existence until one party to it has done all that is necessary on his part; it is performance by one party which makes obligatory the promise of the other."

Assignments of Error Nos. 3, 5, 6, and 7 are therefore sustained because of the failure of the plaintiff to introduce any evidence tending to establish that a binding "Commitment" was procured to refinance defendants' property. Assignments of Error, 1, 2 and 8 are without merit under the evidence presented here and are therefore overruled.

This leaves Assignment of Error No. 4 dealing with a part of the court's charge to the jury. In one part of the general charge, the court charged the jury on the law of a unilateral contract as follows:

"The Court further charges you that the agreement in writing in this case signed by the defendants authorizing or hiring the plaintiff to find and obtain a commitment for a loan of $8,000 on defendant's property in order to refinance said property, is what is known in law as a unilateral contract. Such authorization by the defendants of the plaintiff to attempt to refinance the property is not a contract. It is simply a naked revocable power, an offer to pay for services when rendered and if performed before revocation. However, this written agreement would become a contract when the plaintiff found someone who would refinance the property and the plaintiff obtained from him a commitment to refinance said property, and that the party that made this commitment was ready, willing and able to refinance the property.

"If you so find by a preponderance of the evidence, then it would be too late for the defendants to revoke the authority they had given to the plaintiff. Performance by the plaintiff makes the written agree-

ment a binding contract on both defendants and the plaintiff. **The plaintiff complied with this promise, that is to find and obtain a commitment from someone who would refinance the property, and the defendants became obligated to comply with their promise to pay $700 for such services.**" (Emphasis added.)

The last paragraph was clearly wrong. The court, in effect, instructed the jury that there was no issue of fact as to whether or not a "commitment" under the terms of the contract between the parties had been procured by the plaintiff. The jury was told that a commitment as contracted for had been procured by the plaintiff and that the defendants were obligated to pay the contract price. This was prejudicial error that would require a reversal of the judgment. However, having concluded that there was no evidence to support the claim that the plaintiff procured a commitment prior to defendants' withdrawal from the agreement, the judgment of the trial court is reversed and final judgment entered for the appellants.

Judgment of the trial court is reversed and final judgment entered for the appellants. Exceptions. Order see journal.

HURD, PJ, KOVACHY, J, concur.