**UNITED STEEL WORKERS OF AMERICA, LOCAL NO. 1330 et al., Plaintiffs,**

v.

**UNITED STATES STEEL CORPORA- TION, Defendant.**

No. C 79–2337 Y.

United States District Court, N. D. Ohio, E. D.

Order Feb. 29, 1980.

On Injunctive and Declaratory Relief March 21, 1980.

On Violation of Antitrust Laws April 14, 1980.

On February 28, 1980, a pretrial conference took place to consider plaintiffs' motion for preliminary relief and to discuss the question of this Court's jurisdiction. The conference lasted the full day and both plaintiffs and defendant were given ample opportunity to adduce their arguments on the matters of irreparability of harm and likelihood of success on the merits.

This Court has grave doubts about the propriety of this Court's exercise of jurisdiction over the merits of this case. Undoubtedly, however, this Court has jurisdiction to determine the question of its jurisdiction. *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938). Pursuant to this jurisdiction, this Court grants plaintiffs' motion for preliminary injunction based on this Court's determination that there is a probability of irreparable harm to plaintiffs if the status quo is not maintained. Particularly, this Court finds that defendant's announced plan of February 4, 1980, that the shutdown of the plants would be accelerated over previous representations, if put into effect, would hinder the orderly consideration of the important matters involved in this action.

Therefore, defendant is enjoined from proceeding with such plans as it might have to close any of its Youngstown District facilities pending the ultimate disposition of this cause by the Court. No bond will be required.

IT IS SO ORDERED.

### ON INJUNCTIVE AND DECLARATORY RELIEF

The evidence of this action having been fully presented by plaintiffs and defendant in a five-day trial to this Court sitting in its equity power to consider the propriety of injunctive relief, the Court now turns to the task of finding the facts of the allegations and concluding how the law is properly to be applied.

In this action, the workers at the Mahoning Valley, Ohio, plants of United States

### ORDER

LAMBROS, District Judge.

Now this Court considers plaintiffs' motion for injunctive relief *pendente lite*.

Steel Corporation seek to enforce the alleged promise of the company to keep those plants open so long as they remain profitable. This suit was precipitated by the announced plan of the company to shut down the steel mills. On February 28, 1980, this Court temporarily enjoined the company from closing the plants; trial on the merits was advanced to March 17, 1980, so that the important issues embodied in this action might be given full and prompt consideration.

## I.

This nation is in the throes of growing pains of similar intensity to the traumatic changes brought by the advent of the steam engine and the Industrial Revolution. From the turn of the century until the decade prior to this, the United States has been in an expansionary period brought on by plentiful energy and raw materials, technological leadership, and the insatiable maw of four major wars. Steel was the backbone of this expansion, and the dominance of the automobile in this period was a major source of support to the burgeoning steel industry. In the 1960's it appeared that this expansion and economic dominance had no limiting factor and that a rising gross national product and standard of living could be expected to become a permanent part of American Life.

The 1970's, however, were a time of serious reappraisal. The country's energy supplies were limited and controlled by a foreign cartel. The technological success of our allies, especially the Federal Republic of Germany and Japan, although welcome from the standpoint of the strengthening of the free world, made it clear that economic cooperation and not coercion would be the order of the new decade. This shift in economic power had a particularly strong effect in the automotive industry, and the influx of foreign cars meant the influx of foreign steel. Perhaps most importantly, the advent of peace after the conflict in Vietnam and the continuation from that period of a foreign policy of detente and non-interference have required a massive reallocation of capital, labor and technological research. The beating of swords into ploughshares is and will be a painful process of relocation and restructuring, though the prospect of a more permanent peace suggests that the changes *must* be made.

This lawsuit is a symptom of the changes discussed above. The Environmental Protection Agency, in considering an exemption for the Mahoning Valley region of Eastern Ohio from several environmental quality guidelines, extensively reviewed the plight of steel in the Mahoning Valley. Its conclusions, in the form of interim final regulations, were these:

Tentative analysis of the available data leads to the conclusion that conditions in the Mahoning River Valley region are unique with respect to the physical and geographical characteristics of the region, physical and operating characteristics of the facilities located therein, and the importance of the facilities to the economy of the region. Tentative analysis of the available data and the consultant's evaluation thereof appears to support the contention that mandatory compliance with effluent limitations guidelines which do not take into account these factors is likely to result in severe economic dislocation within the Mahoning River Valley region . . . . .

In addition to similar economic disadvantages resulting from age and size characteristics, facilities in the region appear to share economic disadvantages caused by locational characteristics. These include the movement of markets away from the region, constrained access to raw materials due to the unavailability of waterborne transportation and required transshipment by rail, and space limitations which prohibit major expansion of existing facilities. [40 Fed.Reg. 12994.]

United States Steel decided to close its plants in the Mahoning Valley, and approximately 3500 workers became victims of the economic shifts forced on this nation by recent events.

The workers asked this Court for injunctive relief to keep the plants operating and

their jobs intact. United States Steel answered that lack of profitability forced it to close and that it had a right to make this management decision, and the issues were thereby joined.

## II.

On December 21, 1979, plaintiffs filed this action and asked for a temporary restraining order. At a pretrial conference on January 22, 1980, it was determined that if a hearing on the merits could be had before the end of March, 1980, no immediate action by the Court was necessary. Based on this representation, the Court scheduled a pretrial conference for February 28, 1980, and set trial on the merits for March 17, 1980.

By letter of February 4, 1980, the Court was informed by counsel for defendant that the shutdown schedule for the Youngstown plants had been advanced. It became apparent that this Court would have to grant preliminary relief prior to trial on the merits in order to preserve its own jurisdiction. Consequently, this Court heard oral argument on the preliminary relief at the February 28, 1980, pretrial conference. At that time, the Court and both parties discussed the theories of the case and the possibility of irreparable harm. After a full day of thoughtful argument from both plaintiffs and defendant, this Court granted a temporary restraining order to preserve the status quo and thereby its own jurisdiction, and confirmed plans to proceed with trial on the merits on March 17, 1980. A written Order journalizing these proceedings was filed by the Court on February 29, 1980.

Defendant then sought a stay of the enforcement of the February 29, 1980, Order pending an emergency appeal to the United States Court of Appeals for the Sixth Circuit. The stay was denied. Defendant then sought a stay on the appellate level and a reversal of this Court's February 29th Order in the Sixth Circuit. On March 12, 1980, the Sixth Circuit denied the motion for stay and affirmed this Court's injunctive Order while modifying that Order to a temporary restraining order of definite period. The Sixth Circuit viewed the restraining order as of ten-day duration with an additional ten-day extension. On March 19, 1980, this Court granted a preliminary injunction to maintain the status quo for the few remaining days of trial, with the promise of a prompt decision at the conclusion of the evidence.

## III.

The Second Amended Complaint suggests four theories in support of injunctive relief—breach of contract, promissory estoppel, violation of anti-trust statutes and property right.

The breach of contract and detrimental reliance claims are based on a series of communications by employees of defendant to the workers at the Mahoning Valley plants. Plaintiffs allege these communications constitute a promise by the company to keep the mills operating if and so long as the workers made the mills profitable. These statements are set forth in paragraph ten of the Complaint.

From the standpoint of Ohio contract law, the alleged contract must be either unilateral or bilateral—that is, parties must either exchange a promise for a promise or a promise for an act. In the action at bar, plaintiffs' allegations can be simplified to this: the company promised to keep the plants operational as long as they remained profitable, and the workers did in fact make the plants profitable. Plaintiffs never allege in the Complaint or show in the evidence that the workers, either individually or through their union, promised the company that they would make the plants profitable. Therefore, the contract must be of the unilateral, promise-exchanged-for-an-act, variety. *Peizer v. Bergeon,* 111 Ohio App. 205, 14 O.Ops.2d 124, 83 O.L.Abs. 45, 164 N.E.2d 790. However, at the time the alleged promise was made by the company, the workers did not immediately execute the contract in full—profitability would have to be achieved over a long period of hard work. This means that the contract would not come into existence until the workers had fully performed their side of

the contract by making the plant profitable. "[A unilateral] contract does not come into existence until one party to it has done all that is necessary on his part." 17 O.Jur.3d Contracts, § 8.

■ The promissory estoppel argument requires that a promise that the promissor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promissee and that does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise. Restatement, Contracts, § 90.

The statements by employees of the company to the workers are crucial to the contract and estoppel claims because they are at the heart of the two basic issues the Court must decide: were the statements offers to enter into a unilateral contract that were binding on the corporation? and, should the company reasonably have expected the workers to rely on those statements?

■ Clearly, the formation of a proper contract requires that the employee of the corporation who makes a promise must have the authority to enter into the contract. The Supreme Court of Ohio has held that unless express authority is conferred upon an officer or agent of the corporation or there appears to be a clear course of dealing with the world implying authority in an officer or agent, the corporation can be bound only by its board of directors. *Bradford Belting Company v. Gibson*, 68 Ohio Sup. 442, 67 N.E. 888. Plaintiffs have offered no evidence to show such an express or implied authority in any of the corporation's officers to make the promise to keep the plants open if the workers made the plants profitable. Defendant has repeatedly made clear that no such authority existed. There is no basis for the claim in contract.

Promissory estoppel, however, is a less rigid concept, being part of the equity powers of the Court. The lack of a technical power of agency in any of the company's spokesmen does not relieve the company

from a binding promise if it should reasonably have expected the statements of the spokesmen to be relied upon detrimentally by the workers. This is a more subtle point and requires an examination of the particulars of the statements and a judgment by this Court of the reasonableness of reliance.

Many of the statements were messages communicated to the employees by an internal telephone network called the "hot-line." William Kirwin, Manager of the Youngstown facilities, explained in testimony that various members of the management and public relations sectors of the company would record a short tape message. That message would then be connected to a system of in-plant telephones so that a worker could pick up a special hot-line telephone receiver and hear the recorded message. The message could not be heard on conventional telephones outside the plant.

The hot-line messages never make clear a promise to remain open if the workers made the plant profitable. A September 1, 1977, message said there were "no immediate plans to permanently shut down" and that "the continued operation of these plants is absolutely dependent upon their being profit-makers." However, the statement that lack of profitability would close the plants does not imply the converse, that the plants will *not* close if they *are* profitable. William Kirwin's numerous hot-line remarks (on January 4, 1978, January 11, 1978, April 7, 1978, November 8, 1978 and December 21, 1978) come close to embodying the promise alleged by plaintiffs, especially such comments as these: "With your help, this effort will continue and if and when there will be a phase-out depends on the plants' profitability, but no timetable has been set." "Our future is what we make it." "I am asking each of you to consider how you may help in keeping Youngstown the going plant it is today."

Mr. Kirwin's remarks, however, must be considered in the context of their delivery. The hot-line was begun, according to Kirwin, as a mechanism for communicating safety tips to the workers, and was later expanded into a tool for correcting false

rumors that might be spread through the plant and appear in the media. This Court has carefully read and reread Mr. Kirwin's messages, attempting to put itself in the place of a steelworker hearing those messages during 1977, 1978 and 1979. The Court concludes that the reasonable understanding to be drawn from those messages is this: The United States Steel plants in the Mahoning Valley are in trouble and a shutdown is imminent; the board of directors of the corporation will base the shutdown decision largely on profitability; if the plants become profitable it may affect management's shutdown decision; therefore, the most effective thing the workers can do to save their jobs is to work efficiently to help the profitability picture.

It is clear to this Court that Mr. Kirwin was dedicated to his job and to the employees of the steel plants. He believed that steel could be effectively produced in the Mahoning Valley. He wanted desperately to save the mills. Toward that goal he embarked on a "morale" program to attempt to get the workers in Youngstown to make steel profitable. Although this speaks highly of Mr. Kirwin's ability and dedication, it also suggests that his statements were not necessarily those of the national company management. For example, on January 3, 1978, Edgar Speer, then Chairman of the Board of Directors of United States Steel, affirmed that at some point the Ohio and McDonald Works would have to be closed. Mr. Kirwin's hot-line remarks of January 4, 1978 and January 11, 1978, were directed toward explaining Mr. Speer's remark. It was at this point that Mr. Kirwin stated "if and when there will be a phase-out depends on the plant's profitability."

The other remarks alleged in paragraph ten of the Complaint are less troubling. Remarks made to the media by various employees of the company cannot reasonably be construed as embodying a promise made to the workers, especially when the statements were made by public relations people and not company officers [see the statements of Frederick Foote and Randall Walthius].

■ It is this Court's considered opinion that a reasonable understanding of all of the statements alleged in paragraph ten of the Complaint would suggest that national company management wanted to close the plant for lack of profitability and that the call for increased worker productivity was a plan William Kirwin was presenting as a final effort for the workers to sway national management opinion. Mr. Kirwin's plan was courageous and well conceived, but it did not represent a promise made by the corporation on which the workers should reasonably have relied.

IV.

■ There is a second, independent ground for denying relief under the contract and detrimental reliance theories, and that is the failure of the condition precedent to defendant's liability—the profitability of the Mahoning Valley plants.

Plaintiffs attempted to demonstrate profitability by defining minimum profitability as the "gross profit margin", which William R. Roesch, President and Chief Operating Officer of United States Steel, described as "the revenues minus the variable costs of performing the operation to produce the product." [Transcript, page 148.] He admitted that "technically, if you are losing money at the gross margin operation, there is no way to make that operation profitable." [Transcript, page 149.] Plaintiffs then turned to their exhibits 32 through 37, which were summary sheets of operating profitability for the Youngstown facilities for 1977, 1978, 1979, and 1980. These exhibits revealed that the gross profit margin for 1977 was $24,899,000.00, that for 1978 was $41,770,000.00, that for 1979 was $32,571,000.00 and that the projected gross profit margin for 1980, as of November 20, 1979, was $32,396,000.00. [Plaintiffs' Exhibit 72.]

These figures do indicate that at the variable-cost margin, the plant was, in a sense, profitable. It should be remembered, however, that even with the projected $32,396,000.00 gross profit margin projected for

1980, the *over-all* projection for the year was a loss of $9,387,000.00. This suggests that with a different definition of profit, especially one that would include fixed costs, the outcome of an accounting analysis could be made to be non-profitability. Mr. Roesch testified that the gross profit margin "does not represent the profit of the operation." [Transcript, page 182], nor does it represent that the operation is necessarily profitable, considered as a whole [Transcript, page 183]. He explained that "[t]here are other factors involved because, once you have the gross margin, you have to subtract the depreciation for the equipment which was involved and depreciate it over a period of time; you have to subtract the selling expenses which are necessary; and you have to subtract the administrative charges, the taxes, and so forth." [Transcript, page 183.] He also explained that, because of the integrated system of the national corporation, many of the unseen costs of the Youngstown Works were absorbed by other plants and operations in the steel company. [Transcript, page 183.] Mr. Roesch testified that it was primarily the obsolescence of the plant facilities that made the plant unprofitable. [Transcript, pages 185–193.]

The testimony of David Roderick, Chairman of the Board of Directors and Chief Executive Officer of United States Steel, confirmed Mr. Roesch's opinion. In answer to the question "And through the end of October, 1979, Youngstown [sic] the performance of that year was in the area of about the break even, was it not?" Mr. Roderick replied ". . . the actual number was about a $300 thousand loss, as of the end of October, cumulative for the year. And further, as I recall, they had lost money three out of the four months preceding it." [Transcript, pages 226–227.] Further, Mr. Roderick explained the opinion of the Board of Directors on the trend of the loss in this way:

Well, what I really mean by an irreversible loss is based on our best judgment, or my best judgment, the loss would be incurred and there was nothing the plant could do to avoid that loss, that the market was working negatively and that it was our projection that the plant would lose money in five out of six months of the second half, that the loss for the year would be quite substantial in 1979, and with all the facts that we could see on the horizon for 1980, plus the actual performance for the second half of 1979, we felt there was no way that the loss trend could be reversed for the calendar year of 1980. [Transcript, page 229.]

This Court is loathe to exchange its own view of the parameters of profitability for that of the corporation. It is clear that there is little argument as to the production figures for the Youngstown mills—the controversy surrounds the interpretation of those figures. Plaintiffs read the figures in light of a gross profit margin analysis of minimum profitability. Defendant sees capital expenditure, fixed costs and technical obsolescence as essential ingredients of the notion of profitability. Perhaps if this Court were being asked to interpret the word "profit" in a written contract between plaintiffs and defendant, some choice would have to be made. Given the oral nature of the alleged promises in the case at bar and the obvious ambiguity of the statements made, this Court finds that there is a very reasonable basis on which it can be said that Youngstown facilities were not profitable. Further, plaintiffs have made no showing of bad faith on the part of the Board of Directors in the Board's determination of profitability, nor have they given any grounds to suggest that defendant's definition of profitability is an unrealistic or unreasonable one. The condition precedent of the alleged contract and promise—profitability of the Youngstown facilities—was never fulfilled, and the actions in contract and for detrimental reliance cannot be found for plaintiffs.

There was a great deal of testimony at trial concerning the various acts of forbearance allegedly taken by the plaintiffs on the basis of the statements made to them by company management. Those acts are set forth in paragraph eleven of the Complaint.

The testimony of union officials Vasquez and DePetro highlight the allegations of the Complaint. There is no doubt that the workers made a sincere and forceful effort to increase productivity, or "yield", primarily by waiving those formal technicalities of their labor contract that contributed to easier working conditions, but detracted from productivity. Normal procedures for handling the steel, adopted by the union to protect the workers from abusive corporate practices were sometimes circumvented in the interests of efficiency. Mr. DePetro's testimony summarized the efforts of the workers well:

[Mr. DePetro, at a workers' meeting, made the following suggestions, which were later acted upon by the workers:] 'I feel we can talk about attitudes, including management; we can talk about cooperation, including management; we can talk about setting up the mills efficiently: The rougher can tell if there is shearing on bars and make it known for correction; pulpit operators can tell if bars are being pulled; there can be better cooperation between the furnace crew and the roll crew; and there can be better cooperation between the roller and the crew. We can learn other jobs, just in case you might be needed; we can be more efficient on our own jobs. We can strive for better quality, so as to stop our customers from filing claims. We can make sure that our orders are getting to our customers on time, so as not to lose those customers.' [Transcript, pages 581–582.]

This Court is mindful of the efforts taken by the workers to increase productivity, and has applauded these efforts in the preceding paragraphs. In view of the fact, however, that this Court has found that no contract or enforceable promise was entered into by the company and that, additionally, there is clear evidence to support the company's decision that the plants were not profitable, the various acts of forbearance taken by the plaintiffs do not give them the basis for relief against defendant.

## V.

The testimony of all witnesses has made it clear to this Court that the United States Steel facilities at Youngstown were a model of worker productivity, labor/management cooperation and dedicated leadership. Obsolescence, however, has forced even this admirable example of American industry to close its operations.

This is not to suggest, however, that labor and management gave in to the inexorable results of obsolescence without a struggle. On the contrary, the story of the attempts by the workers under the leadership of William Kirwin to fight back the effects of obsolescence demonstrates the basic values of the American economic system.

William Kirwin became General Superintendent of the Ohio and McDonald Works on the first day of February, 1978, having had thirty years of experience at the Youngstown Works in positions ranging from Junior Industrial Engineer to Assistant General Superintendent.

In August of 1977, the national management drafted, but never sent, a letter to the Youngstown employees to this effect: "It is with extreme regret that I inform you that most of the operations at the Youngstown Works will be phased out over the coming months." [Plaintiffs' Exhibits 77 and 78.] That letter was never sent, apparently because Mr. Kirwin and the then Superintendent, Mr. Ashton, had gone to Pittsburgh to ask for another chance to keep the mills alive. National management was persuaded not to send the letter and Mr. Ashton and Mr. Kirwin devised a plan of increased productivity as a means of keeping the plants operating. [Transcript, pages 284–286.] Mr. Kirwin began recording hotline messages urging worker cooperation in an attempt to increase employee moral and raise productivity.

A little later in 1978, Mr. Kirwin initiated the "Beat Texas" campaign. The United States Steel plant at Bay Town, Texas, is the newest plant in the corporation, and Mr. Kirwin thought a slogan asking the Youngstown plant to beat the Bay Town productivity figures would "get the spirit

going and motivation up and so forth." The campaign was successful and the Youngstown productivity outstripped that of the Bay Town plant. In recognition, a ten-foot high cow sporting the slogan "We Beat Texas" was driven from the plant to the Playhouse in town on the occasion of a Management Appreciation dinner in December of 1978. [Transcript page 303.]

The national management praised Mr. Kirwin's activities on numerous occasions, and remarked on the excellent work record of labor in the Mahoning Valley plants. There is no doubt in this Court's mind that if any group of hardworking American citizens could have kept these plants going profitably, the men and women of the Youngstown area could have done it. But the realities of shifts in the economy, technological obsolescence, environmental demands and foreign competition dictated that this was not to be.

The hard work of labor should also not go unnoticed. William Kirwin enlisted the aid of the employees in his crusade to save the mills and they responded by finding ways of contributing to increased productivity. Paragraph eleven of the complaint sets forth the sacrifices of the workers in the cause of increased productivity. `At a meeting Mr. Kirwin had with labor representatives, referred to in testimony as a "Beer with the Boss", Mr. Kirwin reiterated his plan to save the Youngstown Mills. He describes his speech in this way:

. . . I said at the time . . . the next six months could be the most critical six months in the period of the Youngstown Works, and I wanted to get everybody there to see if we couldn't elicit maximum effort in order to try and hold where we were, and I will tell you why—to give me an opportunity to try and sell one more step for Youngstown. [Transcript, page 319.]

It was Mr. Kirwin's untiring search for excellence and pride in the making of steel that prompted him to spearhead the worker's efforts to save their jobs. As he explained "And this was all my hot-lines, what I was trying to do, because I believe so strongly that you should be proud of any job that you have to do, and you should strive your best to do it." [Transcript, page 392.]

VI.

The possibility of the relationships between the steel industry and surrounding community generating a property right was suggested by this Court *sua sponte* at the pretrial conference on February 28, 1980. As this Court explained then:

Everything that has happened in the Mahoning Valley has been happening for many years because of steel. Schools have been built, roads have been built. Expansion that has taken place is because of steel. And to accommodate that industry, lives and destinies of the inhabitants of that community were based and planned on the basis of that institution: Steel. [Transcript, pages 6–7.]

The Court suggested this theory and asked that it be considered and argued by the parties out of a deep sense of concern for the Mahoning Valley community. This Court does not see itself possessed only of the limited function of applying blackletter law to facts in a mechanical way. The function of the legal system since its origin in Grecian antiquity has been the resolution of human conflicts. Without laws and courts, injustice would lead to vengeance and revenge, feud and the vigilante. It is the job of our courts to air grievances and bitterness and to resolve disputes without violence and hatred. In a sense, the court must adjust human relationships.

In pursuit of that goal—adjusting human relationships—this Court has actively sought settlement and resolution throughout the pendency of this action. As this Court emphasized at the February 28, 1980, hearing:

. . . we ought to seek a resolution of the dispute, exploring, perhaps some way of rehabilitation, explore perhaps an opportunity of the steelworkers, of the community, or some other alternatives for the acquisition of those steel works at the Youngstown area, or perhaps some nego-

tiations along the line of U. S. Steel coming up with a formula or a plan in conjunction with the steelworkers for the community for some economic redress to aid their rehabilitation. [Transcript, page 14.]

This Court has spent many hours searching for a way to cut to the heart of the economic reality—that obsolescence and market forces demand the close of the Mahoning Valley plants, and yet the lives of 3500 workers and their families and the supporting Youngstown community cannot be dismissed as inconsequential. United States Steel should not be permitted to leave the Youngstown area devastated after drawing from the lifeblood of the community for so many years.

■ Unfortunately, the mechanism to reach this ideal settlement, to recognize this new property right, is not now in existence in the code of laws of our nation. At this moment, proposals for legislative redress of economic relocation like the situation before us are pending on Capitol Hill. Perhaps labor unions, now more aware of the importance of this problem, will begin to bargain for relocation adjustment funds and mechanisms and will make such measures part of the written labor contract. However, this Court is not a legislative body and can not make laws where none exist—only those remedies prescribed in the statutes or by virtue of precedent of prior case law can be given cognizance. In these terms this Court can determine no legal basis for the finding of a property right. *Charland v. Norge Division, Borg-Warner Corporation*, 407 F.2d 1062 (6th Cir., 1969).

Having disposed of the contract, detrimental reliance and property claims, I now turn to the prayer for relief. I will not order United States Steel to keep the plants open, and the preliminary injunction is hereby vacated.

### VII.

Although I will not order United States Steel to operate the mills, I do order United States Steel to keep the mills operable until the steelworkers have an opportunity to explore purchase possibilities by themselves or by others.

Plaintiffs' final argument is based on an allegation of a violation of the anti-trust laws, 15 U.S.C. §§ 2, 4, 15 and 26. The allegation is based on a proposal by the workers to join together to buy and operate the mills themselves. David Roderick, United States Steel Board Chairman, has made it plain in testimony that he will not sell the plants to any federally subsidized competitor. Since plaintiffs intend to obtain a federal subsidy to aid in the purchase of the plants, Roderick's statements appear to be a refusal to deal.

Parties have largely ignored this aspect of the case, and yet it seems to this Court that there may be some merit to the allegations. It was obvious at trial that neither party was prepared to present substantial evidence on the matter and defendant ignored the claim in its Motion for Judgment at the Close of Plaintiffs' case filed March 20, 1980. Plaintiffs' own counsel admitted in final argument that he felt the Court had not had a chance to hear and consider fully the anti-trust claim. This Court feels at a loss to deal with this important issue on such a meager record. Therefore, this Court sets the date sixty days from this Order as the time for an evidentiary hearing on the merits of this allegation so as to give parties minimum adequate time to prepare the evidence and brief the law. Until that time, this Court orders that defendant be preliminarily enjoined from causing or allowing the closed facilities to become inoperable. This Court can not order the plants to continue to operate, but it can order that the plants remain operable. In simple terms, the facilities are to be put in mothballs for 60 days. Since the plants will be allowed to close, defendants will not suffer the economic harm they have previously alleged, while there would be irrevocable harm to plaintiffs if the plants were dismantled. This, coupled with a showing on the evidence so far presented of a likelihood of success on the merits provides the basis for the preliminary injunction. Rule 65(a), Federal Rules of Civil Procedure.

Fifty days from the date of this Order, parties will appear at a pretrial conference to discuss the status of the anti-trust claims at that point and legal briefs should be filed prior to that time.

Additionally, this Court sees no just cause for delay in entering final judgment on the allegations of contract, estoppel and property right. These theories are based on facts [the promises of the company] different from those that are the basis for the antitrust claim [the refusal to sell]. Final judgment is, therefore, entered for defendant on the allegations of contract breach, detrimental reliance and property right, and the relief prayed for in relation to those allegations relating to the closing of the plant is denied. Rule 54(b), Federal Rules of Civil Procedure.

### VIII.

The Court has extensively presented its findings and commented on the evidence and the law in the preceding sections, so as to give parties an insight into the factors the Court considered in weighing the evidence and reaching its legal conclusions. Now follow the formal findings of fact and conclusions of law:

*Findings of Fact*

1. Plaintiffs are all residents of the State of Ohio. Defendant is a corporation with principal place of business in Pennsylvania that does business in Ohio by owning and operating steel mills in Youngstown and McDonald, Ohio.

2. Defendant never entered into a contract through authorized agents promising to continue operating the Ohio steel mills so long as the plants remained profitable.

3. Although managerial employees of defendant on occasion throughout 1977, 1978, 1979 and 1980 urged plaintiff workers to increase their productivity and also indicated that productivity would be a central factor in deciding if and when the steel mills would be closed, the corporation never promised to keep the mills operating so long as the workers made the mills profitable.

4. It was not reasonable for the workers to interpret the above-mentioned statements of the managerial employees of the corporation as embodying a promise to keep the steel mills open so long as the workers made the mills profitable.

5. It was not reasonable for the workers to construe statements made by public relations employees or other employees of the corporation to the news media as binding on the corporation.

6. The corporation's appraisal of the steel mills as unprofitable has a reasonable basis in the economic evidence and this Court finds that the mills are not profitable to the corporation.

7. Not enough evidence has been presented to reach a conclusion as to the merits of the claims under the Sherman and Clayton Acts.

*Conclusions of Law*

1. Defendant has not breached a contract with plaintiffs by taking action to close the Youngstown and Ohio steel mills.

2. Plaintiff has no claim under the theory of detrimental reliance to ask that the corporation be estopped from denying such a contract right.

3. The claim of plaintiffs that they possess a property right in the nature of an easement fails to state a claim on which relief can be based.

Therefore, plaintiffs' prayer for declaratory and injunctive relief related to the closing of the plants is denied. Judgment on plaintiffs' prayers in paragraph 2, 3b, 3c, 3d, 3e, 3f, 3g, 3h, 3i, 4, 5, 6 and 7 is reserved until the hearing 60 days from this date, as set forth above.

IT IS SO ORDERED.

### ON VIOLATION OF ANTITRUST LAWS

The only issue remaining before this Court is the allegation that United States Steel has violated federal antitrust laws by refusing to sell the closed Mahoning Valley steel plants to the plaintiffs. At the close of trial on the merits, this Court believed that there had been insufficient discussion

of this antitrust allegation by either party to allow the Court to render an informed judgment. Of course, failure to establish fully an allegation normally results in judgment for the defense; however, this Court believed that plaintiffs' meager presentation was occasioned not by acedia, inattentiveness or, necessarily, a lack of a colorable claim, but rather by the sensitive and tentative nature of the negotiations still being conducted at that time that were directly related to the antitrust issues. The Court felt that if more time were given plaintiffs to develop those allegations, the case could be put in a better posture for complete decision. Further, the trial had proceeded on an accelerated basis and, given the fact of partial final judgment on the contract, detrimental reliance and property claims, and the removal of the harsh preliminary injunction associated therewith, this Court decided that the final claim could be allowed to develop at a slower, more contemplative, pace. Trial of the antitrust claim was set for 60 days after the Order of Partial Final Judgment.

Following trial, defendant moved for amendment of judgment pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure. As this Court began to consider the specific nature of the antitrust claims being asserted, it began to entertain serious doubts about the ripeness of this allegation for consideration. Oral argument was set for Thursday, April 3, 1980, on the motion of the defense and an unrelated motion by plaintiffs.

At that oral argument, this Court made it clear that the issue of ripeness weighed heavily on its mind, and plaintiff was asked to proffer its intended evidence and to discuss the current state of purchase negotiations. No evidence was required of plaintiff, merely a proffer of planned testimony. [Counsel for plaintiff protested that he had been promised by the Court's Clerk that no evidence would be taken—this was a *non sequitur* given the Court's assurances that no evidence was required; plaintiffs' counsel also suggested that he was not prepared to speak on the subject at that time—this was either the product of unnecessary mod-

esty or of a fear that the Court had uncovered a central problem in plaintiffs' case since Ray Sawyer, the attorney for plaintiffs who was orchestrating the proces of obtaining federal funding for the proposed employee purchase, was present in the courtroom, and, along with Mr. Lynd, was allowed to address the Court directly. In any event, given the fact that this Court could have compelled plaintiff to present all its evidence during the March trial in Youngstown, it was not unreasonable to ask merely that the Court be advised as to the current status of the action; and, in fact, Mr. Lynd and Mr. Sawyer were able to give a detailed factual presentation. This Court should note here its appreciation of Mr. Sawyer's candor and helpfulness in getting to the bottom line of the purchase negotiations.]

■ Having considered the new details of the current status of the case, the Court has concluded that its initial presentiment was correct—this final claim is not ripe for adjudication and must be dismissed.

The doctrine referred to as 'ripeness' is one of the most evanescent of the threshold issues to be considered by a Court before reaching the merits. Professors Wright, Miller and Cooper explain

> The most general theme in denying adjudication is that the plaintiff's control means that the future events that would raise the offered questions may never happen. A major component of such determinations inevitably must be a uniquely case oriented evaluation of the practical probabilities, as near as the court's common sense and knowledge of human nature can make out.

Wright, Miller and Cooper, 13 Federal Practice and Procedure § 3532 (1975).

Based on plaintiffs' proffer on April 3, 1980, the current status of the employee attempt to purchase the mills is this: one hundred million dollars in loan guarantees has been set aside by the Economic Development Administration to support a viable steel project in the Mahoning Valley at the suggestion of the Undersecretary of the

Treasury. The workers, under the aegis of the Ecumenical Coalition, applied for this money and were rejected. More recently, the workers have incorporated under the name "Community Steel, Incorporated," and they have reapplied for those loan guarantees. There has been no final or preliminary commitment from EDA, although plaintiffs believe they can meet EDA's guidelines.

Plaintiffs admit that, in all probability, they need the loan guarantees to buy the mills. Further, the most probable use for the guarantees would be to obtain an Urban Development Action Grant, a method of using local public or private financing to purchase or rebuild, where the local financing is obtained on the strength of the federal government's loan guarantee. Thus, even if federal agency action is favorable, plaintiff, doing business as Community Steel, Inc., would have to secure independent local financing. No such local financing was suggested in plaintiffs' proffer.

This creates a number of possibilities: plaintiff might secure the federal guarantee and the local financing, make an offer to U. S. Steel, and be refused in favor of another purchaser of the steel facilities; plaintiff might secure all of the necessary funding and guarantees, make an offer to U. S. Steel, and be refused in favor of a purchaser, not of the steel facilities, but of the land and buildings for reasons unrelated to steel production; plaintiff might secure all the necessary funding and guarantees only to find that U. S. Steel will sell to no one; plaintiff might find that no government funding is necessary, in which case Mr. Roderick, the Chairman of the Board, has indicated he would sell the plant to plaintiffs [although the plant may not be for sale, or Mr. Roderick may have changed his mind since testifying]; plaintiff might be unable to obtain financing. All of these combinations are possible and the Court is at a loss to order the choices in terms of probability. In some cases, there would be no liability, in others, liability is arguable. Finally plaintiff, has not suggested that a declaratory judgment from this Court would affect the obtaining of a letter of intent from EDA, which would be essential to any closer clarification of the ambiguities presented above.

One final consideration is that this antitrust issue would require an analysis of specific intent to monopolize on the part of defendant. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (6th Cir. 1979). Also, there would be a need for consideration of possible valid business purposes as a defense. *Id.* These two issues could hardly be seriously entertained when the defendant is unsure as to the nature of the offer it is alleged to refuse. An offer to buy is not just the final money amount—it is a package of financing, as every home buyer knows. Defendant must be aware of the financing package made by the workers, and must reject that offer before any court can seriously deal with allegations of specific intent to monopolize. The case is not ripe to be heard and is therefore dismissed. *Aetna Life Insurance Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

IT IS SO ORDERED.